IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EVELYN CAMPBELL, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 10-184-GMS <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM

### I. INTRODUCTION

The plaintiff, Evelyn Campbell ("Mrs. Campbell"), brought this action against the United States of America (the "United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). (D.I. 1.) Mrs. Campbell's husband, Elmer Campbell ("Mr. Campbell"), died as a result of metastatic colo-rectal cancer in 2007. Mrs. Campbell alleges that his death was caused by negligent treatment received at the United States Department of Veterans Affairs Medical Center in Elsmere, Delaware (the "VA"). Mrs. Campbell claims entitlement to damages for mental anguish and lost contribution of support.

The court held a bench trial on January 22–23, 2013 and March 21, 2013. The parties have since submitted post-trial briefing.[1] (D.I. 50; D.I. 53.) Below are the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### II. FINDINGS OF FACT

Mr. Campbell was a veteran of the United States military who received medical treatment

---

[1] In addition to post-trial briefing, the parties submitted a Joint Appendix. References in this memorandum to the appendix use the abbreviation "JA."

at the VA between May 1992, when he was 38 years old, and his death on February 17, 2007, at age 52. (JA at 293.) Mr. and Mrs. Campbell were married on August 9, 1985 and remained married for approximately twenty-two and a half years, until Mr. Campbell's death. (*Id.* at 11.) Between November 1995 and August 1998, the couple worked together driving tractor-trailers over long distances. (*Id.* at 14.) The nature of this work could take them away from home for sometimes as much as a month. (*Id.* at 15.) Mr. Campbell had been driving for some time before Mrs. Campbell joined him on the job. (*Id.* at 17–18.)

Mr. Campbell was first hospitalized at the VA on September 19, 1992 for supraventricular tachycardia ("SVT"), a serious heart condition. During this admission, his medical records indicated that Mr. Campbell refused to have certain cardiology tests performed due to his fear of needles. (*Id.* at 204.) His next visit to the VA was on February 23, 1993 for complaints of pain in one of his fingers. (*Id.* at 262.)

On March 11, 1993, Dr. James Thomas, a VA employee, performed a compensation and pension exam ("C&P exam") on Mr. Campbell to determine whether a complained-of hand injury was incurred in connection with his military service and whether he was entitled to the benefits for which he had applied.[2] (D.I. 50 at ¶ 12; D.I. 53 at ¶ 8; JA at 267–68.) During this appointment, Dr. Thomas performed a broader physical exam and documented a small external hemorrhoid, guaiac positive stool, and an absence of internal masses on a rectal exam. (D.I. 50 at ¶ 9; D.I. 53 at ¶ 13; JA at 271.) A positive guaiac test indicates hidden or trace amounts of blood in a patient's stool. (D.I. 50 at ¶ 13; D.I. 53 at ¶ 9; JA at 140–41.) Dr. Thomas' report

---

[2] The C&P exam was referred to as both a "compensation and pension exam" and a "compensation and physical exam" at trial and in the parties' post-trial briefing. (D.I. 50 at 4; D.I. 53 at 3; JA at 47.)

notes that he recommended a gastroenterology follow-up to rule out internal hemorrhoids as the cause of the guaiac positive stool. (JA at 271.)

The government's expert, Dr. Joshua I. S. Bleier, M.D., opined that this 1993 visit produced no violation of the standard of care owed to Mr. Campbell, describing the C&P examination as simply "a data-gathering effort."[3] (*Id.* at 217.) On the other hand, Mrs. Campbell's expert, Dr. Mark Levin, M.D., declined to offer an opinion as to the standard of care applicable at a C&P examination.[4] (*Id.* at 164.)

Mr. Campbell missed subsequent appointments with Dr. Santram in the VA medical clinic on March 24, 1993, and with Dr. Reddy in the VA cardiology clinic on April 20, 1993. (*Id.* at 207.) On May 27, 1993 he was examined by Dr. Heiman, a cardiologist and internist at the VA, who documented continued SVT and scheduled blood work for the next appointment, which was to occur on November 24, 1993. (D.I. 40 at 9; D.I. 50 at ¶ 14; D.I. 53 at ¶ 53.) Mr. Campbell also cancelled that appointment. (D.I. 40 at 9; D.I. 50 at ¶ 14; JA at 207.) Dr. Heiman's records from the May 27, 1993 visit do not indicate that there was any discussion concerning Dr. Thomas' guaiac positive finding or the suggestion that Mr. Campbell follow up with gastroenterology. (JA at 310.)

---

[3] Dr. Bleier is a graduate of the University of Pennsylvania School of Medicine and is board certified in both General Surgery and Colon and Rectal Surgery. He has served as an assistant professor of surgery at the University of Pennsylvania School of Medicine since 2008 and has also served as an attending surgeon at the Veterans Administration Medical Center in Philadelphia. (D.I. 40 at ¶ 2(e)(2); JA at 188–90.)

[4] Dr. Levin is a graduate of the State University of New York Downstate Medical College and is board certified in Internal Medicine, Oncology, and Hematology and certified by the American Board of Quality Assurance and Utilization Review. He served as an assistant and associate professor of clinical medicine at the Department of Medicine at the State University of New York Medical College from 1991 through 2000 and as an associate professor of medicine at the June and Sanford L. Wyle Medical College (Cornell) in 2003. He later worked as an associate professor of medicine at the Medical College of New Jersey from 2005 to 2008 and as a clinical associate professor of medicine at the Medical College of New Jersey from 2008 to 2009. Dr. Levin presently holds a hospital appointment at the Holy Name Hospital Department of Medicine. (D.I. 40 at ¶ 2(e)(1); JA at 137–38.)

Subsequently, Mr. Campbell failed to keep appointments with Dr. Heiman on March 8, August 5, and August 23, 1994. (*Id.* at 207, 291; D.I. 50 at ¶ 15; D.I. 53 at ¶ 12.) During this stretch, Mr. Campbell was seen once at the VA, when he reported sinus troubles in the medical clinic on May 19, 1994. (D.I. 50 at ¶ 15; JA at 207, 259.) On January 27, 1995, Mr. Campbell again saw Dr. Heiman and reported no new issues. (D.I. 50 at ¶ 16; JA at 208, 255.) The records from this visit do not contain any reference to the possibility of colon cancer. (JA at 208, 255.) He then had approximately annual appointments with Dr. Heiman on March 6, 1996 and March 10, 1997, and the notes from these appointments are also silent as to Dr. Thomas' recommended gastroenterology follow-up. (D.I. 50 at ¶ 16; JA at 208, 255.) Mr. Campbell was not seen by anyone at the VA between March 1997 and October 1999. (D.I. 50 at ¶ 16; D.I. 53 at ¶ 14.)

Dr. Levin testified that the applicable standard of care between March 1993 and October 1999 required efforts to follow up on the gastroenterology issues noted in Dr. Thomas' C&P report. (JA at 142.) He further gave his expert opinion that, had a colonoscopy been performed in March 1993, it would have revealed a small lesion that could have been removed through the colonoscope and that this early procedure would have made further treatment unnecessary. (*Id.* at 160.) In Dr. Levin's view, if this lesion had been removed in March 1993, Mr. Campbell would not have followed the course that ultimately led to his death. (*Id.* at 160–61.) Dr. Bleier did not offer an opinion as to the standard of care owed by Mr. Campbell's VA providers during this period. (*Id.* at 238.) He noted only that he was not a primary care physician and was unqualified to comment on whether the standard of care required the review of a patient's medical history before his appointment. (*Id.*)

On October 3, 1999, Mr. Campbell was examined in the cardiology department for SVT and admitted to the hospital. (D.I. 50 at ¶ 18; D.I. 53 at ¶ 15; JA at 274.) A blood test revealed low hemoglobin and microcytic anemia. (D.I. 50 at ¶ 18; D.I. 53 at ¶ 15; JA at 48.) Dr. Reddy advised Mr. Campbell that he should remain in the hospital and receive a full workup to determine the cause of the anemia. (D.I. 50 at ¶ 18; D.I. 53 at ¶ 15; JA at 245–46.) Mr. Campbell, however, asked to be discharged and indicated that he preferred to follow up with his primary care physician. (D.I. 50 at ¶¶ 18–19; D.I. 53 at ¶ 15; JA at 287–88.) Dr. Reddy or his residents recommended to both Mr. and Mrs. Campbell that Mr. Campbell have a colonoscopy, and the discharge instructions given to Mr. Campbell advised: "You should have a colonoscopy to check for colon cancer." (JA at 51–52, 249.)

Dr. Bleier opined that there was no violation of the applicable standard of care in Mr. Campbell's October 1999 treatment. (*Id.* at 217–18.) Further, Dr. Bleier and Dr. Levin agreed that, even if a colonoscopy had been performed and a proper diagnosis made at that time, Mr. Campbell still would have had less than a fifty-percent chance of survival.[5] (*Id.* at 181–82, 218.)

An appointment was made with Mr. Campbell's primary care provider, Dr. Kraft, on November 1, 1999. (*Id.* at 246.) Mr. Campbell, however, missed both this appointment and a rescheduled visit on November 15, 1999. (*Id.* at 292.) On February 7, 2000, Mr. Campbell finally did see Dr. Kraft. (*Id.* at 289.) While Dr. Kraft testified that it was generally his practice to review a patient's medical records before seeing them, he could not recall whether he

---

[5] Dr. Levin, however, also testified that a diagnosis before approximately May 2000 would have affected the type of treatment available to Mr. Campbell and somewhat improved his chances of surviving the cancer. (JA at 161.)

reviewed Mr. Campbell's before this appointment and noted that scheduling did not always permit for such a review. (*Id.* at 84-85.) Dr. Kraft's note from this visit does not indicate whether he asked Mr. Campbell about the colonoscopy recommendation nor does it document any discussion or performance of a rectal examination. (*Id.* at 289.) The note does reflect that Dr. Kraft sought to have blood work done but that Mr. Campbell refused. (*Id.*)

Mr. Campbell then missed his next two scheduled appointments with Dr. Kraft. He eventually saw Dr. Kraft again on May 22, 2000. (*Id.* at 280.) While Dr. Kraft's note from that visit states "hopefully he will agree to blood draw today," there is no record of any blood test actually being performed. (*Id.*) There was no documented discussion of hemorrhoids, a rectal examination, or a colonoscopy. (*Id.*)

Dr. Levin testified that, under the applicable standard of care, Dr. Kraft should have been aware that a gastroenterology follow-up and colonoscopy were recommended in October 1999 and should have discussed with Mr. Campbell whether any follow-up ever occurred. (*Id.* at 149.) Again, Dr. Bleier noted that he was not a primary care physician and was unqualified to comment on whether the standard of care required a review of a patient's medical history. (*Id.* at 238.)

Mr. Campbell saw Dr. Kraft again on July 31, 2000, complaining of pain with passing stool. (*Id.* at 281.) Dr. Kraft performed a rectal examination and noted both external and internal hemorrhoids. (*Id.* at 290.) A blood test was performed, and Dr. Kraft discovered iron deficiency anemia. (*Id.* at 95, 103.) In light of this finding, Dr. Kraft ordered an emergent colonoscopy, which was performed by Dr. Mills-Robertson on August 18, 2000. (*Id.* at 95-96, 282-83.) Prior to the colonoscopy, Dr. Mills-Robertson performed a rectal examination and

discovered a mass within a finger length of the anus. (*Id.* at 76.) The subsequent colonoscopy and biopsy revealed a malignant mass approximately ten centimeters in length. (*Id.* at 77–79.)

Following this diagnosis, Mr. Campbell underwent extensive treatment at the VA, including neoadjuvent chemo radiation and surgical resection. (D.I. 50 at ¶ 24; D.I. 53 at ¶ 21.) Mr. Campbell eventually died from metastatic colorectal cancer on February 17, 2007. (D.I. 50 at ¶ 25; D.I. 53 at ¶ 21; JA at 293.)

## III. DISCUSSION & CONCLUSIONS OF LAW

### A. Federal Tort Claims Act and Delaware Law

The FTCA grants jurisdiction to the district courts over civil actions brought against the United States "for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Since the conduct at issue occurred in Delaware, the law of Delaware governs Mrs. Campbell's malpractice claims. *See FDIC v. Meyer*, 510 U.S. 471, 477–78 (1994).

Under Delaware law, "medical negligence" is defined as "any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient." 18 Del. C. § 6801(7). Section 6801 further provides that "[t]he standard of skill and care required of every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed in the same or similar field of medicine as defendant, and the use of reasonable care and diligence."

*Id.*

In addition to a breach of the applicable standard of care, a plaintiff alleging medical negligence must demonstrate that the conduct in question was a proximate cause of the patient's injury or death. *Timblin v. Kent Gen. Hosp. (Inc.)*, 640 A.2d 1021, 1024 (Del. 1994). "Proximate cause is defined as 'that direct cause without which the [injury] would not have occurred.'" *Id.* (quoting *Chudnofsky v. Edwards*, 208 A.2d 516, 518 (Del. 1965)). "In order to prove proximate cause, the plaintiff must show that the physician's negligence was the probable cause of the injury, *i.e.*, the likelihood was greater than 50 percent that the negligence caused the injury." *Id.* A plaintiff is required to provide "expert medical testimony as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death." § 6853(e); *see also Timblin*, 640 A.2d at 1023–24. "Expert medical testimony may also be introduced by a defendant to show that the applicable standard of care was met or that any departure therefrom did not cause the plaintiff's injury." *Timblin*, 640 A.2d at 1024.

Here, Mrs. Campbell frames her FTCA action as a medical malpractice claim under Delaware's wrongful death statute, 10 Del. C. § 3721 *et seq.* Section 3722 provides that "[a]n action may be maintained against a person whose wrongful act causes the death of another."[6] § 3722(a). Mrs. Campbell's particular claim arises under provisions of § 3724 that permit recovery for "mental anguish" and "loss of contributions for support" resulting from the death of

---

[6] "'Wrongful act' means an act, neglect or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." 10 Del. C. § 3721(5).

8

a spouse.[7] § 3724(d)(2), (5).

B. Medical Negligence

The court concludes that no medical negligence occurred with respect to Mr. Campbell's treatment in March 1993, October 1999, or 2000.

The only expert testimony presented regarding the standard of care expected in the March 1993 examination came from Dr. Bleier who opined that Dr. Thomas, in fact, "went above and beyond" the degree of care required in the "data-gathering" context of a C&P examination. Dr. Levin, on the other hand, declined to offer an opinion as to the applicable standard of care. The court credits Dr. Bleier's testimony and concludes that no breach occurred at the VA in March 1993.

Likewise, on the basis of Dr. Bleier's expert testimony, the court concludes that that there was no violation of the applicable standard of care in the October 1999 treatment by Dr. Reddy and his team. Mr. Campbell was explicitly advised of the need for a colonoscopy to rule out colon cancer, and the VA providers actually urged him to stay in the hospital and have the procedure done at that time. Not only did Dr. Reddy's warnings meet the degree of care ordinarily employed in such a context—they, in fact, were all that Dr. Reddy could do. The court further notes that Dr. Bleier and Dr. Levin both testified that even if a proper diagnosis had been made in October 1999, Mr. Campbell still would have had less than a fifty-percent chance of survival. As such, the court cannot find that any hypothetical breach by Dr. Reddy or his team

---

[7] The precise nature of Mrs. Campbell's wrongful death claim is not entirely clear. Her Complaint demands compensation for both mental anguish and lost contribution, (D.I. 1 at ¶ 17), but her post-trial briefing states that "Ms. Campbell as surviving spouse present [sic] only a claim for mental anguish," (D.I. 53 at 12). The court, however, need not resolve this ambiguity given its below conclusions regarding comparative negligence. *See infra* Section III.C.

9

would have operated as a proximate cause of Mr. Campbell's ultimate death.[8]

Finally, the court cannot find any medical negligence in Dr. Kraft's treatment of Mr. Campbell in February and May 2000. While the relevant expert testimony indicated that Dr. Kraft should have been aware that a gastroenterology follow-up and colonoscopy were recommended in October 1999 and should have discussed with Mr. Campbell whether any follow-up ever occurred, both Dr. Levin and Dr. Bleier agreed and the court concludes that Mr. Campbell had less than a fifty-percent chance of survival by October 1999. As such, any breach of the standard of care by Dr. Kraft in 2000 could not have functioned as a proximate cause of Mr. Campbell's death and cannot form the basis for medical negligence.[9]

The court, however, believes that the VA was negligent in failing to follow up with Mr. Campbell regarding the 1993 colonoscopy recommendation between March 1993 and October 1999. During this period, Mr. Campbell was seen at the VA on at least four occasions, but there

---

[8] When a patient already has a greater than fifty-percent chance of death, a doctor's failure to provide adequate treatment or diagnosis cannot be characterized as the proximate cause of his eventual death. *See United States v. Cumberbatch*, 647 A.2d 1098, 1103 (Del. 1994) (citing *Shively v. Klein*, 551 A.2d 41, 43–44 (Del. 1988)). Of course, Delaware law does recognize the "loss of chance" doctrine, which allows "a plaintiff to recover damages for the diminution of that person's chance of survival, where that diminution was caused by the negligence of a defendant, even though the person already had a greater than fifty percent probability of not surviving." *Kardos v. Harrison*, 980 A.2d 1014, 1017 (Del. 2009). "An important distinction is that '[i]f an injury is suffered in the loss of chance situation, it is the reduced possibility of survival which is the basis of the claim, not the death itself.'" *Id.* (quoting *Cumberbatch*, 647 A.2d at 1103).

Mrs. Campbell's FTCA medical malpractice claim, however, is brought under Delaware's wrongful death statute, and the Supreme Court of Delaware has made clear that a plaintiff cannot obtain compensation for the loss of chance of survival or recovery in an action under 10 Del. C. § 3724. *Cumberbatch*, 647 A.2d at 1099. This is because the wrongful death statute requires that the alleged negligence actually cause death, §§ 3722, 3725, while the resulting injury in the "loss of chance" context is merely the reduced possibility of survival, *see Anderson*, 669 A.2d at 76; *Cumberbatch*, 647 A.2d at 1103. Furthermore, "Delaware law requires that a claim of medical negligence, including the loss of chance theory, must be pleaded with particularity," *Dishmon v. Fucci*, No. 06C-12-231-DCS, 2013 WL 2151695, at *4 n.42 (Del. Super. May 16, 2013) (citing *Shively*, 551 A.2d at 44), and Mrs. Campbell's Complaint failed even to mention this theory, (D.I. 1). As such, even if the VA had breached the applicable standard of care in October 1999, the causation requirement would bar Mrs. Campbell from recovery.

[9] *See supra* note 8.

is no record of Dr. Heiman or any other VA provider discussing Dr. Thomas' recommendation, the need for a colonoscopy, or the potential of colo-rectal cancer. In the absence of any contrary expert testimony, the court credits Dr. Levin's testimony that the applicable standard of care between March 1993 and October 1999 required efforts to follow up on the gastroenterology issues noted in Dr. Thomas' C&P report. (*Id.* at 142.) The absence of such efforts represents a breach of the duties owed to Mr. Campbell. Moreover, the court finds that this series of failures served as a proximate cause of Mr. Campbell's eventual death. As noted above, Dr. Levin testified that a colonoscopy performed in March 1993 would have discovered a lesion, that this lesion would have been small, and that its early removal would have altered Mr. Campbell's course.

C. Comparative Negligence

Under Delaware law, even where a defendant's negligence has been shown, a plaintiff may be barred from recovery where he has also acted negligently. The relevant statute provides:

> In all actions brought to recover damages for negligence which results in death or injury to person or property, the fact that the plaintiff may have been contributorily negligent shall not bar a recovery by the plaintiff or the plaintiff's legal representative where such negligence was not greater than the negligence of the defendant or the combined negligence of all defendants against whom recovery is sought, but any damages awarded shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

10 Del. C. § 8132. This modified comparative negligence provision bars a plaintiff from obtaining any recovery when his share of the demonstrated negligence is greater than that of the defendant.[10] *See Asbestos Litig. Pusey Trial Grp. v. Owens-Corning Fiberglass Corp.*, 669 A.2d

---

[10] By its plain language, § 8132 appears to be inapplicable to wrongful death actions such as this in which the defendant argues that the *decedent* acted negligently. 10 Del. C. § 8132. The statute speaks only to the contributory negligence of the *plaintiff*, § 8132, and the plaintiff in this action is Mrs. Campbell, who brings this

11

108, 112 (Del. 1995).

Here, the court finds that Mr. Campbell also acted negligently in failing to follow up on Dr. Thomas' colonoscopy recommendation.[11] "It is the duty of a patient to use such care as a man of ordinary prudence would ordinarily use in circumstances like his own." *Rochester v. Katalan*, 320 A.2d 704, 709 (Del. 1974). Whether due to his fear of needles, the travel required by his trucking job, or simply an unwillingness to confront his potential medical issues, Mr. Campbell fell far short of this standard in failing to inquire about a colonoscopy following the

---

derivative claim in her own name, not as a representative of Mr. Campbell, *see Cumberbatch*, 647 A.2d at 1102–03. Nevertheless, Delaware courts have understood that a decedent's own negligence or assumption of the risk can operate to bar or reduce recovery by a wrongful death plaintiff. *See, e.g., Caine v. New Castle Cnty.*, 379 A.2d 1112, 1115–16 (Del. 1977) (discussing potential effect of contributory negligence by decedent); *Estate of Mitchell v. Allen Family Foods, Inc.*, No. 10C-06-005-JOH, 2013 WL 870664, at *2 (Del. Super. Mar. 1 , 2013) (discussing potential effect of comparative negligence by decedent); *Parlin v. Dyncorp Int'l, Inc.*, No. 08c-01-136-FSS, 2009 WL 3636756, at *7 (Del. Super. Sept. 30, 2009) (discussing potential effect of primary assumption of the risk by decedent).

[11] The court, however, rejects any attempt by the government to base its comparative negligence argument on Mr. Campbell's missed blood work appointments. The government argues that "[i]t is clear that attempts were made by multiple providers at the VA between 1993 and 2000 to schedule various tests, performance of which more likely than not would have led to an earlier diagnosis of colon cancer" but that "the patient himself rendered an earlier diagnosis impossible, by repeatedly failing to keep appointments and comply with recommended testing." (D.I. 50 at 16–17.) It fails, however, to particularly identify those "various tests" or to support its assertion that the tests likely would have resulted in earlier diagnosis. While the record is clear that Mr. Campbell missed or canceled several blood work appointments, the court cannot find that attending those appointments would have led to an earlier diagnosis or, more importantly, saved Mr. Campbell's life.

Dr. Levin testified that, had blood work been done between March 1993 and May 2000, it would have revealed anemia. (*Id.* at 179.) Dr. Bleier's direct examination, however, produced the following exchange:
> Q. Is there any way to know at what time, if the patient had had a blood test done, a year before, two years before, three years before, that it would have been possible to document the anemia which then would have given rise to looking for colon cancer? Is there any way to know that?
> A. There is no way to know for sure how long the anemia was present or how long the tumor had been present. But presumably, for some significant period of time, the anemia would have been developing.
> Q. Can we say more likely than not it was present in 1993?
> A. I would not say more likely than not it was present in 1993. I think we had evidence that he was not anemic in 1993.
> Q. Can we say it in 1996?
> A. It would be difficult to speculate as to what time he developed a cancer that was friable enough that started to shed enough blood to make him anemic. Presumably, within a year or two or three of the diagnosis, there would have been some degree of anemia.

(*Id.* at 209–10.) In light of this testimony, it is not even clear that a blood test in 1992 or 1993 would have uncovered anemia, let alone caused an earlier diagnosis of cancer or prevented Mr. Campbell's death.

12

March 1993 C&P examination. During this approximately six-year period between that examination and his October 1999 hospitalization, Mr. Campbell never discussed Dr. Thomas' recommendations with his VA providers. Further, given the court's above finding that the VA physicians' failure to ensure a gastroenterology consult after the C&P examination served as a proximate cause of his death, it must also conclude that Mr. Campbell's own unreasonable delay was a proximate cause.[12]

Having determined that both the VA providers and Mr. Campbell acted negligently, the court next "apportions liability on the basis of the extent of each actor's contribution to the injurious result, *i.e.* proximate causation." *Moffitt v. Carroll*, 640 A.2d 169, 175 (Del. 1994) ("[A]fter the trier of fact finds that two or more actors were independently negligent, the amount of negligence attributed 'comparatively' to each actor is determined based upon the extent to which their respective negligent conduct contributed to the occurrence of the harmful event."). The court finds that Mr. Campbell's contribution was greater than the defendant's. While Dr. Heiman and the other treating physicians failed to counsel a gastroenterology follow-up on a few scattered occasions during this period, Mr. Campbell's negligence was continuous, as he refused for over six years to heed Dr. Thomas' medical advice. The bulk of the responsibility must lie with the patient himself, who had ongoing and numerous opportunities to address the 1993 guaiac positive finding.

## IV. CONCLUSION

---

[12] The Supreme Court of Delaware has noted that "[p]ursuant to the Delaware [comparative negligence] statute, the apportionment of comparative negligence is a 'separate consideration' which should be examined by the trier of fact only after the elements of each actor's individual negligence (duty, breach of duty, and proximate causation) have first been determined." *Moffitt v. Carroll*, 640 A.2d 169, 175 (Del. 1994). As such, the court must consider not only whether Mr. Campbell's failure to pursue the colonoscopy recommendation was unreasonable but also whether it functioned as a proximate cause of his death.

13

For the reasons discussed above, the court will grant judgment in favor of the defendant.

Dated: September 12, 2013

_____
CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EVELYN CAMPBELL,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Civil Action No. 10-184-GMS |

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

Judgment is entered in favor of the defendant, the United States of America, and against the plaintiff, Evelyn Campbell.

Dated: September 12, 2013

CHIEF, UNITED STATES DISTRICT JUDGE